**Lisa A. Amato,** OSB No. 920253
Email: laa@wysekadish.com
WYSE KADISH LLP
621 SW Morrison, Suite 1300
Portland, Oregon 97205
Telephone:  (503) 228-8448
Facsimile:   (503) 273-9135

Of Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| SYLVIA M. PHARR, | ) | Case No. 3:14-cv-1404-PK |
| | ) | |
| Plaintiff, | ) | MEMORANDUM OF LAW IN |
| | ) | SUPPORT OF DEFENDANT'S MOTION |
| v. | ) | FOR SUMMARY JUDGMENT |
| | ) | |
| BURGERVILLE, LLC, dba, | ) | |
| BURGERVILLE | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.    INTRODUCTION TO ARGUMENT ................................................................ 1

II.   LEGAL STANDARD.............................................................................. 2

   A.  Summary Judgment Standard ............................................................ 2

   B.  Pharr's Claims against Burgerville ..................................................... 4

      1.  Legal Theories......................................................................... 4

      2.  The Substantive Analysis under Pharr's Legal Theories Are the Same ......... 5

III.  FACTUAL SUMMARY .......................................................................... 6

   A.  Employment History with Burgerville.................................................. 6

   B.  Burgerville's Zero Tolerance Policy toward Drugs and Alcohol and Policy against
       Harassment and Discrimination. ......................................................... 7

   C.  Factual Allegations ...................................................................... 8

      1.  Work Schedule ....................................................................... 8

      2.  Drive-thru Training ................................................................. 10

      3.  Overall Job Performance........................................................... 11

      4.  Allegations of Discrimination and Retaliation................................... 15

IV.   ARGUMENT ................................................................................... 17

   A.  Pharr Cannot Establish a *Prima Facie* Case of Race Discrimination............... 17

      1.  Pharr Was Not Qualified To Work the Drive-Thru ............................... 19

      2.  Pharr Was Scheduled In the Same Manner as All Other Employees............. 20

      3.  Termination of Employment ....................................................... 22

   B.  Pharr Cannot Establish a *Prima Facie* Case of Harassment........................ 23

   C.  Pharr Cannot Establish a Prima Facie Case of Retaliation ......................... 25

   D.  Pharr's Common Law Wrongful Discharge Claim Should be Dismissed........... 27

VI    CONCLUSION................................................................................. 29

# TABLE OF CASES AND AUTHORITY

## Cases

*Ahmed v. Mid-Columbia Med. Ctr.*,
  673 F.Supp.2d 1194 (D. Or. 2009) ...................................................................................... 6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................... 3, 4

Arnold v. Pfizer, Inc.,
  970 F.Supp.2d 1106 (2013) .......................................................................................... 28

*Babick v. Oregon Arena Corp.*,
  333 Or. 401, 40 P.3d 1059 (2002) ................................................................................ 26

*Battan v. Allwest Underground, Inc.*,
  Civ. No. 08–707–BR, 2008 WL 4191467 (D.Or. Sept. 5, 2008) ................................... 28

*Brooks v. City of San Mateo*,
  229 F.3d 917 (9th Cir. 2000) ......................................................................................... 25

*Campbell v. Knife River Corp. – Northwest*,
  783 F.Supp.2d 1137 (D.Or. 2011) .................................................................................. 6

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................ 2

*Chuang v. University of California Davis*,
  225 F.3d 1115 (9th Cir. 2000) ....................................................................................... 18

*Cordova v. State Farm Ins. Cos.*,
  124 F.3d 1145 (9th Cir. 1997) ....................................................................................... 17

*Cornwell v. Electra Cent. Credit Union*,
  439 F.3d 1018 (9th Cir. 2006) ....................................................................................... 17

*Courtney v. Oregon Dept. of State Police*,
  Civ. No. 06–6233–TC, 2008 WL 2726931 (D.Or. July 11, 2008) ................................. 27

*Dawson v. Entek International*,
  630 F.3d 928 (9th Cir. 2011) ........................................................................................... 6

*Delaney v. Taco Time Int'l, Inc.*,
  297 Or. 10 (1984) .......................................................................................................... 27

*Draper v. Astoria School District No. 1C*,
   995 F.Supp. 1122 (D.Or. 1998) ...................................................................................27

*Dunwoody v. Handskill Corp.*,
   185 Or.App. 605, 613 (2003)........................................................................................27

*Fed. Trade Commission v. Stefanchik*,
   559 F.3d 924 (9th Cir. 2009).........................................................................................3

*Fred Meyer Inc. v. Bureau of Labor & Industries*,
   39, Or.App. 253, 264 (1979)..........................................................................................5

*Halseth v. B.C. Towing, Inc.*,
   Civil No. 04–795–JE, 2005 U.S. Dist. LEXIS 42080 (D.Or. Aug. 23, 2005) ......................................28

*Harris v. Pameco*,
   170 Or.App. 164 12 P.3d 524 (2000)............................................................................24

*Hayes v. Wal-Mart Stores, Inc.*,
   781 F.Supp.2d 1080 (D.Or. 2011) ...............................................................................23

*Henry v. Portland Dev. Comm'n.*,
   No. CV-06-712-HU, 2006 WL 4008709 (D.Or. Oct. 18, 2006)............................................27

*Jauregui v. City of Glendale*,
   852 F.2d 1128 (9th Cir.1988)..........................................................................................5

*Logan v. West Coast Benson Hotel*,
   981 F.Supp 1301 (D.Or. 1997) ....................................................................................25

*Logan v. West Coast Benson Hotel*,
   981 F.Supp. 1301 (D.Or. 1997) ......................................................................................6

*Long v. City & County of Honolulu*,
   511 F.3d 901 (9th Cir. 2007)...........................................................................................3

*Manatt v. Bank of American, NA*,
   339 F.3d 792 (9th Cir. 2003)...........................................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)........................................................................................................3

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)........................................................................................................6

*McGinest v. GTE Serv. Corp.*,
  360 F.3d 1103 (9th Cir. 2004) .................................................................................................. 5

*Moustachetti v. Oregon*,
  319 Or. 319, 325, 877 P.2d 66 (1994) ...................................................................................... 26

*Ogawa v. Malheur Home Tel. Co.*
  CV 08-694-MO, 2010, WL 1542559 (D.Or. Apr. 14, 2010) ................................................... 3

*Porter v. Cal. Dep't. Corr.*,
  419 F.3d 885 (9th Cir 2005) ....................................................................................................... 23

*Rabkin v. Oregon Health Sciences University*,
  350 F.3d 967 (9th Cir.2003) ....................................................................................................... 27

*Raytheon Co. v. Hernandez*,
  540 U.S. 44 (2003) ...................................................................................................................... 18

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) .................................................................................................................... 18

*Reid v. Evergreen Aviation Ground Logistics Enterprises, Inc.*,
  Civ. No. 07–1641–AC, 2009 WL 136019 (D.Or. Jan. 20, 2009) .......................................... 28

*Shaare Tefila Congregation v. Cobb*,
  481 U.S. 615 (1987) ...................................................................................................................... 4

*Snead v. Met. Prop. & Cas. Ins. Co.*,
  237 F.3d 1080 (9th Cir. 2001) ..................................................................................................... 6

*St. Francis College v. Al-Khazraji*,
  481 U.S. 604 (1987) ...................................................................................................................... 5

*Stegall v. Citadel Broad. Co.*,
  350 F.3d 1061 (9th Cir. 2003) ................................................................................................... 24

*Suever v. Connell*,
  579 F.3d 1047 (9th Cir. 2009) ..................................................................................................... 3

*Surrell v. California Water Serv. Co.*,
  518 F.3d 1097 (9th Cir. 2008) ................................................................................................... 23

*T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987) ....................................................................................................... 3

*Texas Dep't of Community Affairs v. Burdine*,
   450 U.S. 248 (1981)............................................................................................18

*Vasquez v. City of Los Angeles*,
   349 F.3d 634 (9th Cir 2004)..............................................................................24

*Vasquez v. County of Los Angeles*,
   349 F.3d 634 (9th Cir. 2003)............................................................................17

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1053 (9th Cir. 2002)...........................................................................25

*Wallis v. J.R. Simplot Co.*,
   26 F.3d 885 (9th Cir. 1994) ..............................................................................18

**Statutes**

O.R.S. §659A.030.............................................................................................. passim
O.R.S. §659A.030.................................................................................................. 5, 28
O.R.S. Chapter 659A ....................................................................................... 4, 23, 26

**Other Authorities**

42 U.S.C. §1981............................................................................................ 4, 5, 26, 27
42 U.S.C. §2000e-2(a)(1)....................................................................................... 5
42 USC §1981.................................................................................................... passim
42 USC §1981(b) ..................................................................................................... 5
Title VII 42 U.S.C. §2000......................................................................................... 4

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................ 2, 3

Defendant Burgerville, LLC (Burgerville) has moved for summary judgment in its favor on all of the claims for relief in Plaintiff Sylvia Pharr's (Pharr) Complaint. Burgerville submits the following memorandum of law in support of its motion for summary judgment.

## I.        INTRODUCTION TO ARGUMENT

This case arises out of Pharr's employment as a Crew Member at the Burgerville Hawthorne location. Pharr's Complaint is not a model of clarity. For purposes of Summary Judgment, Burgerville assumes that Pharr alleges that during her employment she was subjected to discrimination, harassment and retaliation in that she was denied training on the drive-thru, placed on a performance improvement plan, and was terminated because she is African American in violation of federal and state laws.[1] Pharr also alleges a wrongful discharge claim.

Burgerville denies that it created, condoned or tolerated a work environment that was hostile or discriminatory to Pharr and denies it retaliated against her in any way. Burgerville admits that Pharr is African American but denies that it took any adverse employment action against her because of her race. On Pharr's last day of employment, her supervisors reasonably observed signs of Pharr being under the influence of alcohol. Pursuant to Burgerville's drug and alcohol policy, Pharr was asked to take a breathalyzer test. Pharr refused to take the breathalyzer test, and pursuant to the drug and alcohol policy her refusal was deemed a positive result. Following an investigation, Pharr's employment was terminated.

---

[1] For purposes of summary judgment only, Burgerville assumes that Pharr intended to bring her claims under both federal and state law despite pleading deficiencies which will be challenged at trial.

Burgerville files this motion for summary judgment for the following reasons:

1.      Pharr cannot establish a *prima facie* case that she was subject to discrimination or harassment because she African American, in violation of 42 U.S.C. §1981 or O.R.S. §659A.030, and Burgerville had a legitimate non-discriminatory reason for terminating Pharr's employment.

2.      Pharr cannot establish a *prima facie* case that she was subject to retaliation because she is African American in violation of 42 U.S.C. §1981, Title VII, or O.R.S. §659A.030, and Burgerville had a legitimate non-discriminatory reason for terminating Pharr's employment.

3.      Pharr's claim for wrongful discharge is precluded by Title VII, 42 U.S.C. §1981, and O.R.S. §659A.030.

## II.      LEGAL STANDARD

**A.      Summary Judgment Standard**

Summary judgment is appropriate if the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. (quoting Fed. R. Civ. P. 56(c)).  To determine

whether there is a genuine issue of material fact sufficient to preclude summary judgment, the court must accept all evidence and make all inferences in the nonmoving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once Burgerville shows that there are no genuine issues of material fact for trial, Pharr cannot rest on the pleadings but must respond with evidence setting forth "specific facts showing a genuine issue for trial." *Celotrx Corp.* at 322-23; *Fed. Trade Commission v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir 2009) (internal quotations omitted); *Ogawa v. Malheur Home Tel. Co.*, CV 08-694-MO, 2010, WL 1542559 at 2 (D.Or. Apr. 14, 2010), citing Fed. R. Civ. P. 56(c). Pharr may not simply rely on the pleadings. She must go beyond the pleadings and designate facts showing an issue for trial.

Pharr must produce significant probative evidence supporting her claims that a genuine issue of material fact exists. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir 1987). Summary judgment is appropriate if Pharr fails to offer "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell,* 579 F.3d 1047, 1056 (9th Cir 2009). The court views inferences drawn from the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Long v. City & County of Honolulu,* 511 F.3d 901, 905 (9th Cir 2007). If the factual context makes Pharr's claim as to the existence of a material fact implausible, Pharr must come forward with more persuasive evidence to support her claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The

mere existence of a scintilla of evidence in support of Pharr's position would be insufficient."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 at 252 (1986). When the "record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue

for trial. *Ogawa,* 2010 WL 1542559 at 2, citing *Matsushita Elec. Indus. Co.* at 587 (1986).

**B.      Pharr's Claims against Burgerville**

     **1.      Legal Theories**

Pharr asserts three claims against Burgerville: (1) that she was subjected to race

"discrimination and/or retaliation" and harassment in violation of 42 U.S.C. §1981 and O.R.S.

Chapter 659A; (2) that she was subjected to "race retaliation" in violation of Title VII 42 U.S.C.

§2000 et seq. and O.R.S. Chapter 659A; and (3) wrongful discharge.

When the record is taken as a whole, it will show that Pharr's claims, as to the existence

of material facts, are implausible, and that Pharr does not have sufficient evident to present a

genuine issue for trial on any of her claims.

At issue is whether during Pharr's employment at Burgerville, (1) Pharr was subject to

discrimination or harassment because of her race, or if she was retaliated against for opposing

unlawful employment practices in violation of 42 U.S.C. §1981 and O.R.S. Chapter 659A; (2)

Pharr was retaliated against for opposing unlawful employment practices in violation of Title VII

42 U.S.C. §2000e, et seq. and O.R.S. Chapter 659A; and (3) whether Pharr was wrongfully

discharged under Oregon common law.   Burgerville moves for summary judgment against each

and every one of Pharr's claims.

42 U.S.C. §1981 prohibits discrimination in the making and enforcement of contracts by reason of race. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987); *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987). The Civil Rights Act of 1991 amended Section 1981 to provide that: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race…." 42 U.S.C. §2000e-2(a)(1). A person suffers disparate treatment in his employment "'when he or she is singled out and treated less favorably than others similarly situated on account of race.'" *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir 2004) (internal quotation marks omitted) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir.1988)).

O.R.S. §659A.030 prohibits an employer from discriminating against any person regarding compensation or terms, conditions, or privileges of employment because of that person's race, color, sex, religion, or national origin. Harassment based on a person's membership in a protected class is a form of disparate treatment discrimination. *See, e.g., Fred Meyer Inc. v. Bureau of Labor & Industries*, 39, Or.App. 253, 264, 592 P.2d 564 (1979) (harassment based on race constitutes discrimination in conditions or privileges of employment).

2. **The Substantive Analysis under Pharr's Legal Theories Are the Same**

There are three types of discrimination claims under 42 U.S.C. §1981, Title VII and O.R.S. §659A.030: disparate treatment, hostile environment, and retaliation. The substantive

analysis for all three types of claims under the statutes are the same. *Manatt v. Bank of American, NA,* 339 F.3d 792, 797 (9th Cir 2003) ("legal principles guiding a court in a Title VII dispute apply with equal force in a §1981 action"); *Campbell v. Knife River Corp. – Northwest,* 783 F.Supp.2d 1137, 1147 (D.Or. 2011) (standard for establishing a *prima facie* case of discrimination under O.R.S. §659A.030 is identical to that used to establish a *prima facie* case of discrimination under Title VII); *Ahmed v. Mid-Columbia Med. Ctr.,* 673 F.Supp.2d 1194, 1206 (D.Or. 2009) (standards for proving a claim under O.R.S. §659A.030 are the same as must be met to establish a claim under Title VII); *Logan v. West Coast Benson Hotel,* 981 F.Supp. 1301, 1319 (D.Or. 1997).

The substantive analysis follows the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Although Oregon courts do not follow the *McDonnell Douglas* burden-shifting analysis when analyzing claims under O.R.S. §659A.030(1)(b), the *McDonnell Douglas* burden-shifting analysis is a federal procedural law and thus applies to §659A.030 claims brought in federal court. *Dawson v. Entek International,* 630 F.3d 928 (9th Cir. 2011); *Snead v. Met. Prop. & Cas. Ins. Co.¸* 237 F.3d 1080, 1092 (9th Cir. 2001).

### III.    FACTUAL SUMMARY

**A.    Employment History with Burgerville.**

Pharr is an African American female. Complaint ¶2. On March 4, 2012, she was hired as a Crew Member by the Burgerville restaurant located on S.E. Hawthorne. Complaint ¶5; Helzer Dec. ¶6. Pharr's employment was terminated twenty months later on November 9, 2013 when

she refused to take an alcohol breathalyzer test, pursuant to Burgerville's drug and alcohol policy. Helzer Dec. ¶32, Ex 20.

As a Crew Member, Pharr's duties included taking customer orders while standing at the cash register or drive-thru window; gathering food items to fill customer orders; operating the grills; cleaning and mopping the entire restaurant and collecting litter in the parking lot; restocking supplies and maintaining equipment as needed throughout the day; and replenishing soft drinks and french fries, among other tasks. Crew Members perform these duties as assigned, based on their skills and performance, but they are all part of the same job description and pay range. Helzer Dec. ¶4, Ex 1.

**B.      Burgerville's Zero Tolerance Policy toward Drugs and Alcohol and Policy against Harassment and Discrimination.**

Burgerville has a comprehensive employee handbook which includes policies against harassment and discrimination and a zero tolerance policy toward drugs and/or alcohol in the workplace and testing. Halpern Dec. ¶5. Pursuant to Burgerville's zero tolerance policy, where Burgerville has probable cause that an employee is in violation of this policy, the employee will be required to submit to testing to determine the presence, or use or any involvement with alcohol or drugs. An employee's failure to provide samples for testing will be considered insubordination and grounds for immediate suspension and later termination. Helzer Dec. ¶6.

On the date that Pharr was hired she was given an employee handbook that included Burgerville's policy regarding harassment and discrimination, as well as Burgerville's Alcohol and Drug Free Workplace Policy and Probably Cause Drug Test. Helzer Dec., Exhibit 2; Halpern

Dec., Ex 1.  Pharr signed acknowledgments stating that she read and understood those portions of the handbook. Amato Dec., Ex. 1 Pharr Dep. 29:7-12, 29:19-25, 30:1-3.

+++Pharr knew that Burgerville has a zero tolerance policy for alcohol and drug use and knew that an employee could be tested at any time based on reasonable suspicion. Amato Dec., Ex. 1 Pharr Dep. 30:9-25.   When Pharr received the policy, she read it, understood it, did not have any questions, and signed it. Amato Dec., Ex. 1 Pharr Dep. 30:8-23.   Pharr understood that if an employee refused to take a drug and alcohol test, "it would be an admission of guilt" which to her meant that Burgerville "would take it that [the employee] was using drugs. Amato Dec., Ex. 1 Pharr Dep. 30:5-10.  Furthermore, Pharr understood that an employee's refusal to take the test would result in the employee's employment being terminated. Amato Dec., Ex. 1 Pharr Dep. 32:1-18.

## C.      Factual Allegations

Pharr alleges the following incidents form the basis of her lawsuit.

### 1.      Work Schedule

When Pharr was hired, she was earning $8.80 an hour. Amato Dec., Ex. 1 Pharr Dep. 28:21-24.  Pharr admits that she received pay increases during her employment.  The first pay increase was in January 2013 followed by a cost of living increase. Amato Dec., Ex. 1 Pharr Dep. 70:14-16 and 71:8-12.   Pharr wanted as many hours as she could get on the Burgerville schedule. Amato Dec., Ex. 1 Pharr Dep. 37:10-14.  She wanted to be debt free. Helzer Dec. ¶15, Ex. 10.

On the day Pharr was hired, she informed Burgerville that she was available to work "all days and all hours." Amato Dec., Ex. 1 Pharr Dep. 27:1-3; Helzer Dec. ¶6, Ex 3; Huntington Dec. ¶7.  When scheduling employees for work, Burgerville managers take employee availability preferences and skills into consideration and balance employee availability preferences and skills of the nearly 40 other Crew Members at this restaurant location. Helzer Dec. ¶7; Huntington Dec. ¶8.  There is no guarantee of the number of hours an employee will work. Amato Dec., Ex. 2 Helzer Dep. 21:1-3.  How many hours are given to any employee is based on the employee's performance, availability of work, and how busy the restaurant is at a given time. Amato Dec., Ex. 2 Helzer Dep. 21:7-10.

Pharr alleges that Burgerville did not schedule her to work the hours she wanted. Amato Dec., Ex. 1 Pharr Dep. 37:10-24.  She wanted to work forty hours a week. Amato Dec., Ex. 1 Pharr Dep. 37:15-38:2.  Pharr repeatedly requested more work hours even as she reduced her availability. Amato Dec., Ex. 1 Pharr Dep. 37:10-24.   Pharr reduced her availability to work because her "availability was limited;" she does not recall why her availability was limited. Amato Dec., Ex. 1 Pharr Dep. 27:6-20.

Shortly after Pharr's annual performance review in May 2013, on June 4, 2013, Pharr reduced her availability for work because she no longer wanted to work Friday or Saturday after 5:00 p.m.  Amato Dec., Ex. 1 Pharr Dep. 89:18-90:2; Helzer Dec. ¶16, Ex 11; Huntington Dec. ¶16.  On August 25, 2013, Pharr again reduced her availability for work because she no longer wanted to work any day after 5:00 p.m. Amato Dec., Ex. 1 Pharr Dep. 125:14-17; Helzer Dec. ¶22, Ex 11; Huntington Dec. ¶19.

## 2. Drive-thru Training

Pharr had been having difficulties with certain duties at the counter position, but she was making improvements. Helzer Dec. ¶8; Huntington Dec. ¶9. In September of 2012, Pharr received a "corrective action" for a till shortage that she had. Helzer Dec. ¶9, Ex. 4. Pharr admits that she had more than one till shortage and although she cannot recall how many times her till was short, she admits that her supervisors had spoken to her about her till shortages more than once. Amato Dec., Ex. 1 Pharr Dep. 77:15-78:8.

Additionally, throughout Pharr's employment she admits that her supervisors spoke to her about areas in her performance that needed improvement. In Pharr's May 2013 self-evaluation, she herself noted her own areas of improvement which included "to be on time for assigned shifts," "accuracy" and "speed." Amato Dec., Ex. 1 Pharr Dep. 79:4-6, 82:16-83:5; Helzer Dec. ¶15, Ex. 10.

In late 2012, wanting more work hours, Pharr asked to be trained to work at the drive-thru and Burgerville assigned her to the drive-thru on three separate training or shadow shifts. Helzer Dec. ¶10; Huntington Dec. ¶10. When an employee shows proficiency on counter tasks, included limited errors and strong multi-tasking ability, Burgerville will schedule the employee for a shadow sift to see if that employee is a fit for that position. Helzer Dec. ¶10; Huntington Dec. ¶13. If the drive-thru experience goes well Burgerville would provide that employee with more formal training. Helzer Dec. ¶11.

In December 2012, Burgerville assigned Pharr to a shadow shift to see if she was a good fit for the drive-thru position. Helzer Dec. ¶10; Huntington Dec. ¶10. As a result of the drive-

thru shadow shifts, Burgerville was not seeing the level of proficiency it needed to see, including

the fact that Pharr did not have strong multi-tasking skills and she made significant errors as

compared to other employees. Helzer Dec. ¶10; Huntington Dec. ¶10.   Beginning on Pharr's

first shadow shift, she made several mistakes, including double-made milk shakes, a back-up on

food being served, and not keeping up with making fries, and lacked the speed it takes to work

on the drive-thru. Helzer Dec. ¶10; Huntington Dec. ¶10.  These errors and mistakes were

explained to Pharr along with Burgerville's belief that her outgoing demeanor was better suited

for the slower pace of counter with more time to interact with guests and a much more forgiving

atmosphere for potential errors. Helzer Dec. ¶13; Huntington Dec. ¶13, Ex. 5.

In 2013, Pharr continued her request for more training on the drive-thru and Burgerville

gave her two more opportunities to improve her performance. Helzer Dec. ¶¶11, 12.   Pharr

continued to make numerous errors.  Once again, these errors were explained to Pharr along with

the fact that her outgoing demeanor was better suited for the slower pace of counter. Helzer Dec.

¶13; Huntington Dec. ¶13, Ex. 5.

### 3.       Overall Job Performance

Pharr had her first formal annual performance review in May 2013. Amato Dec., Ex. 1

Pharr Dep. 79:4-6.   Burgerville noted areas of improvement, including speed, accuracy,

communication, and time management, and Pharr's self-appraisal included the same areas of

improvement. Amato Dec., Ex. 1 Pharr Dep. 79:4-6; Helzer Dec. ¶15, Ex. 10.  In Pharr's

comments to her performance evaluation, she did not contest her supervisor's evaluation and

only noted that she wanted to be debt free; there was no mention of insufficient hours, or racial

discrimination or harassment of any kind. Amato Dec., Ex. 1 Pharr Dep. 88:2-11; Helzer Dec. ¶15, Ex. 10.

Following Pharr's performance review, she reduced her hours on June 4, 2013, her job performance continued to decline, and Mr. Helzer and Ms. Huntington continued to speak to Pharr about her performance. Helzer ¶¶16, 17; Huntington ¶17. On June 19, 2013, Mr. Helzer and Ms. Halpern formally met with Pharr to discuss performance concerns. Halpern Dec. ¶7, Ex. 2; Helzer Dec. ¶18. At that meeting, Pharr asked for written feedback and communication to help her better perform her job duties and that the areas in which she needed improvement be written down. Helzer Dec. ¶18; Halpern Dec. ¶7, Ex. 2.

Mr. Helzer prepared a 30-day Individual Development Plan (IDP) which is a tool used by Burgerville to communicate areas for improvement. Helzer Dec. ¶18, Ex. 12; Halpern Dec. ¶7. On June 26, 2013, Mr. Helzer and Ms. Halpern met with Pharr to discuss the IDP and the areas in which they wanted to see improvement to assist her in growing her skills. Helzer Dec. ¶19; Halpern Dec. ¶8.

The next day, on June 27, 2013, Pharr called Ms. Halpern to discuss the IDP and in that conversation requested clean dust mop heads to assist her performing her closing duties and also requested a list of duties to do at store closing. Amato Dec., Ex. 1 Pharr Dep. 113:23-114:13; Halpern ¶9, Ex. 3. As Pharr requested, Mr. Helzer provided her with a new mop head. Halpern ¶10.

The IDP was scheduled to continue for 30 days after which point Mr. Helzer and Ms. Halpern were going to assess Pharr's improvement. Helzer Dec. ¶26. It just so happened that

Pharr took personal leave from work in the midst of the IDP, from July 16 through July 29. Amato Dec., Ex. 1 Pharr Dep. 115:4-25.

After Pharr returned from leave, she had a confrontational conversation with her supervisor, Ms. Huntington. Huntington Dec. ¶ 18, Ex. 9; Halpern ¶11; Helzer ¶20. Pharr complained to Ms. Huntington that she was not honoring Pharr's request to not work Friday and Saturday after 5:00 p.m. Amato Dec., Ex. 1 Pharr Dep. 116:5-14; Huntington Dec. ¶18, Ex. 9; Halpern ¶11; Helzer ¶20. During the conversation, Pharr accused Ms. Huntington of being racist for not allowing her to work the drive-thru and scheduling her to work a closing shift. Huntington Dec. ¶18, Ex. 9; Halpern ¶11; Helzer ¶20. Pharr admits that she cannot recall all that was said during the conversation, but does recall asking Ms. Huntington to remove her from the work schedule on days she was not available to work, specifically Friday and Saturday after 5:00 p.m. Amato Dec., Ex. 1 Pharr Dep. 117:1-12.

Burgerville immediately opened an investigation into Pharr's allegations that because of her race she was not being scheduled in the drive-thru and her work availability was not being honored. Helzer ¶21. On August 13, 2013, Mr. Helzer and Ms. Halpern met with Pharr to discuss the events of July 29, 2013, and Pharr raised concerns that she felt she was not scheduled to work on the drive-thru and was not scheduled for the hours she requested because she was African American. Halpern ¶12.

As part of Ms. Halpern's investigation, she conducted interviews with managers, reviewed work schedules, and analyzed Pharr's hours and attendance documents. Ms. Halpern's investigation corroborated Mr. Helzer's and Ms. Huntington's concerns about Pharr's job

performance. Halpern ¶13.   On August 30, 2013, Ms. Halpern informed Pharr and Pharr's managers that the results of the investigation did not substantiate Pharr's concerns of discrimination. Amato Dec., Ex. 1 Pharr Dep. 49:15-50:1; Halpern ¶13, Ex. 5.

On September 4, 2013, Mr. Helzer and Ms. Halpern followed up with Pharr about her IDP. Helzer Dec. ¶25; Halpern Dec. ¶14.   In that meeting, Mr. Helzer discussed with Pharr extending the IDP so she would have time to improve her performance and Pharr agreed to the extension. Helzer Dec. ¶26; Halpern ¶14.   Pharr admits that during the meeting she requested additional written communication about her day-to-day performance so she could track her performance. Amato Dec., Ex. 1 Pharr Dep. 129:5-15; Helzer Dec. ¶26; Halpern Dec. ¶14.

At Pharr's request, Mr. Helzer prepared documentation titled as a series of Records of Conversation and Coaching. Helzer Dec. ¶27.   The purpose of the Records of Conversation and Coaching was that on each shift a manger or team lead would provide Pharr timely feedback on her performance each day. Helzer Dec. ¶27, Ex. 17.   Pharr admits that she found the Records of Conversation helpful. Amato Dec., Ex. 1 Pharr Dep. 129:1-130:25.

On November 9, 2013, Pharr's supervisors that day, Ms. Huntington and Pangia Xiong, contacted Mr. Helzer about Pharr's behavior at work and their concerns that Pharr was under the influence of alcohol. Helzer Dec. ¶28.   Ms. Huntington and Ms. Xiong completed the Burgerville observed behavior checklist and documented their observations, pursuant to the Probable Cause Drug Test policy in which a manager verifies observations if possible. Helzer Dec. ¶29, Ex. 18; Huntington Dec. ¶20 and ¶21, Ex. 11.   After reviewing the completed observed behavior checklist and discussing the matter further with Mr. Helzer, the decision was made to call

American Medical Response (AMR) to give Pharr an alcohol breathalyzer test based on reasonable suspicion that she was under the influence of alcohol in violation of Burgerville's policies. Helzer Dec. ¶30; Huntington Dec. ¶21.

AMR arrived and first gave Pharr a urine drug test. Amato Dec., Ex. 1 Pharr Dep. 135:18-24.  Pharr was then asked to take a breathalyzer test. Amato Dec., Ex. 2 Helzer Dep. 79:15-18; Helzer Dec. ¶31.  Pharr refused the breathalyzer test and began to leave the premises. Huntington Dec. ¶23.  Pharr recalls that she was never asked to take a breathalyzer test, but does recall being told by Ms. Huntington that if she left before taking the breathalyzer test that it "would be an admission of guilt." Amato Dec., Ex. 1 Pharr Dep. 140:7-13, 141:17-19.  The report from the AMR technician who performed the test confirms that Pharr was offered the breathalyzer, refused it, and left the Hawthorne location.  Helzer Dec. ¶31, Ex. 19.  As Pharr was leaving the premises, she was offered safe transportation to her place of residence, which she refused. Helzer Dec. ¶31.

After the November 9, 2013 incident, Mr. Helzer consulted with Ms. Huntington and Ms. Halpern and they evaluated Pharr's continued employment. Helzer Dec. ¶32.   Mr. Helzer decided that pursuant to Burgerville's Alcohol and Drug Free Workplace Policy, Pharr's employment would be terminated as of November 9, 2013. Helzer Dec. ¶32, Ex. 20.

### 4.     Allegations of Discrimination and Retaliation

### a.     Discrimination and Harassment

Pharr recalls complaining to Ms. Halpern that she felt she was being discriminated against, but Pharr does not recall when she made the complaint. Amato Dec., Ex. 1 Pharr Dep.

49:15-19.   Pharr does recall Ms. Halpern conducting an investigation after she made the complaint, and that the investigation ended in a report given to Pharr. Amato Dec., Ex. 1 Pharr Dep. 49:20-50:1.  This time period coincides with the July 29, 2013 incident where Pharr called Ms. Huntington a racist. Helzer ¶19, Ex. 13.

Pharr's only allegations of racial discrimination or harassment, that she complained to Ms. Halpern, that form the basis of this claim is that she felt that she "was being treated differently, and [she] wasn't being given training, and that [she] was the only black person there, and the only one being told that [she] wasn't the right fit to be trained in drive-thru." Amato Dec., Ex. 1 Pharr Dep. 50:11-17.  The only training that Pharr had requested was drive-thru training. Amato Dec., Ex. 1 Pharr Dep. 50:18-22.

### b.      Retaliation

Pharr contends that the June 4, 2015 IDP was put in place in retaliation for her asking for more drive-thru training. Amato Dec., Ex. 1 Pharr Dep. 65:7-8.  Pharr contends that the IDP was retaliation because she had "always been complimented" on her work. Amato Dec., Ex. 1 Pharr Dep. 65:9-12.   However, Pharr admits that before the IDP her supervisors had discussed with her concerns about her performance, including her accuracy in taking orders and giving customers the correct tent number. Amato Dec., Ex. 1 Pharr Dep. 65:13-66:6.  Additionally, Pharr's May 2013 performance review which specifically addressed areas for Pharr's improvement pre-dated the June 26 IDP. Helzer Dec. ¶15, Ex. 10.

# IV.    ARGUMENT

Pharr asserts three claims against Burgerville: (1) she claims that Burgerville harassed or discriminated against her on the basis of her race by failing to provide her training on the drive-thru and in the manner in which she was scheduled for work; (2) she claims that she was retaliated against for complaining that she was denied drive-thru training and about her work schedule; and (3) that she was wrongfully discharged under Oregon law. There are no material issues of fact in dispute.

## A.    Pharr Cannot Establish a *Prima Facie* Case of Race Discrimination

Pharr's initial burden is to establish a *prima facie* case of disparate treatment discrimination. There are two ways that Pharr may establish a *prima facie* case of disparate treatment discrimination under 42 U.S.C. §1981, Title VII, and O.R.S. §659.030(1)(b). Since the same standards are applicable to Pharr's claims under Title VII, 42.U.S.C. §1981 and O.R.S. §659A.030 (1)(b), the facts alleged to give rise to the claims will be discussed together. Pharr may present direct evidence of discriminatory intent that gives rise to an inference of unlawful discrimination. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003); *Cordova v. State Farm Ins. Cos*., 124 F.3d 1145, 1149 (9th Cir. 1997) (referring to an employee as a "dumb Mexican" is direct evidence). Unfortunately for Pharr, there is no direct evidence of discriminatory intent.

Alternatively, Pharr may show that (1) she belonged to a protected class, (2) was qualified for the position in question, (3) was subjected to an adverse employment action, and (4) others who were not in the protected class were treated more favorably. *Cornwell v. Electra*

*Cent. Credit Union*, 439 F.3d 1018, 1031 (9th Cir. 2006).  There is no evidence to support the second and fourth elements - that Pharr was performing her job adequately to receive more drive-thru training or that similarly situated individuals outside of her protected class were treated differently during her employment or at termination.

Under the McDonnell Douglas analysis, Pharr has the initial burden to establish a *prima facie* case of discrimination, hostile work environment, and retaliation on the basis of race. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 124 (2003).  Pharr is unable to satisfy her initial burden and Burgerville is entitled to summary judgment on all of Pharr's claims.

Establishing a *prima facie* case creates a presumption of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  If a *prima facie* case is established, the burden of production shifts to the defendant, who must show evidence that the adverse action was taken for other than impermissibly discriminatory reasons. *See id*.  If the defendant produces such evidence, the presumption of unlawful discrimination disappears, and the plaintiff must show by a preponderance of the evidence that the defendant employer's proffered reason was merely a pretext for a discriminatory motive. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citing *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir. 1985)).

Pretext may be established either by showing that "a discriminatory reason more likely motivated the employer or ... that the defendant's proffered explanation is unworthy of credence." *Chuang v. University of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

always rests with the plaintiff. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 142-43 (2000).

There is no evidence of discriminatory intent that gives rise to an inference of unlawful discrimination. Pharr's only evidence is that she is African American and that for a period of time at the Hawthorne location she was the only African American. She simply argues that she was being treated differently, because she "was the only black person there, and the only one being told that [she] wasn't the right fit to be trained in drive-thru." Amato Dec., Ex. 1 Pharr Dep. 50:14-17. Pharr does not have any direct evidence giving rise to discriminatory intent that she was treated differently because of her race during her employment.

Pharr alleges three adverse employment decisions: 1) not providing her with more drive-thru training; 2) not scheduling her for more hours of work; and 3) termination of employment.

### 1.     Pharr Was Not Qualified To Work the Drive-Thru

Pharr claims that she received "no training" on the drive-thru. Amato Dec., Ex. 1 Pharr Dep. 45:8-11. The evidence is to the contrary.

Pharr admitted in her deposition that she shadowed at the drive-thru although she could not remember when that occurred during her employment. Amato Dec., Ex. 1 Pharr Dep. 51:3-10. Burgerville scheduled Pharr for drive-thru training at three different times during her employment. Helzer Dec. ¶10. At each time, Pharr made numerous mistakes and it was clear to Burgerville that Pharr's skill set was best suited for counter work. Helzer Dec. ¶10, Ex. 5 and ¶13, Ex. 8; Huntington Dec. ¶10 and ¶13, Ex. 5.

There is no dispute about Burgerville's explanation to Pharr about why her skill set was not best suited for the drive-thru. Pharr admits that she had more than one conversation with Mr. Helzer about her skill set on the drive-thru. Amato Dec., Ex. 1 Pharr Dep. 95:7-96:13. As Pharr explained in her deposition, Mr. Helzer said "[I] wasn't the right fit and that drive-thru consisted of -- of more -- more duties, and I had to be faster, and that I just wasn't the right fit to be trained in drive-thru" and he explained that she needed to be able to multitask. Amato Dec., Ex. 1 Pharr Dep. 95:7-96:3.

The only training that Pharr claims she was denied was on the drive-thru. Amato Dec., Ex. 1 Pharr Dep. 45:8-11. She never applied for a different position or sought any promotion during her employment. Amato Dec., Ex. 1 Pharr Dep. 45:20-23. There were no other opportunities to which Pharr claims she was denied. Amato Dec., Ex. 1 Pharr Dep. 46:1-3.

Pharr has produced no evidence that similarly situated individuals outside her protected class were provided drive-thru training. Pharr claims that for a period of time she was the only African American working at that Hawthorne location. Amato Dec., Ex. 1 Pharr Dep. 50:11-17. Beyond that, Pharr has no evidence that another employee who was not in her protected class and who performed as poorly as she did on the drive-thru training received additional training despite their similar poor performance.

**2.      Pharr Was Scheduled In the Same Manner as All Other Employees**

Pharr was scheduled to work within her availability in light of other employee's availability and Pharr's skill set, and Pharr has produced no evidence that other similarly situated employees were treated differently. When scheduling employees for shifts, Burgerville

managers took Pharr's availability preferences and skills into consideration when assigning her work shifts, which needed to be balanced with the preferences and skills of the nearly 40 other Crew Members at this restaurant.  Helzer Dec. ¶7.

Although Pharr kept requesting more hours of work, she consistently reduced her availability to work.  When Pharr was hired, she was available to work "all days and all hours." Amato Dec., Ex. 1 Pharr Dep. 27:1-3; Helzer Dec. ¶6, Ex 3.   She wanted to work forty hours a week.  Amato Dec., Ex. 1 Pharr Dep. 37:15-38:2.   However, beginning on June 4, 2013 Pharr no longer wanted to work Friday or Saturday after 5:00 p.m., and on August 25, 2013, Pharr no longer wanted to work any day after 5:00 p.m.  Amato Dec., Ex. 1 Pharr Dep. 89:18-90:2, 125:14-17.  Helzer Dec. ¶16, Ex 11 and ¶23, Ex. 14.

Pharr was one of nearly 40 Crew Members at the Hawthorne location. Helzer Dec. ¶7. Her reduced availability made it difficult to schedule her for hours which she would accept.  Ms. Huntington did her best to schedule Pharr to work more hours given her skill set, giving her up to at least seven more hours a week and, despite the additional hours, Pharr would complain about the shift assignments. Huntington Dec. ¶15.  For example, Ms. Huntington scheduled Pharr for a "lot and lobby" shift in April 2013.  Pharr was upset that she was scheduled for that shift and confronted Ms. Huntington about the assignment, and Ms. Huntington explained she was trying to schedule Pharr for more hours. Huntington Dec. ¶15, Ex. 7.  Another example was in July 2013 (before Pharr reduced her availability to not work on any day after 5:00 p.m.), in an effort to give Pharr more work hours, Ms. Huntington scheduled Pharr to work a closing shift on July

29, 2013, and it was at the end of that shift that Pharr confronted Ms. Huntington about the schedule called Ms. Huntington a "racist." Huntington Dec. ¶18, Ex. 9.

Pharr wanted to work more hours; however, she kept reducing her availability and while Burgerville made efforts to give her more shifts Pharr complained about the extra shifts. Pharr was unhappy with her work schedule; however, unhappiness does not for the basis of racial discrimination.

### 3.    Termination of Employment

Burgerville terminated Pharr's employment because Pharr refused to take a breathalyzer test. Helzer Dec. ¶32, Ex. 20. When Pharr was hired, she understood that her refusal to take a drug or alcohol test would lead to her losing her job. Amato Dec., Ex. 1 Pharr Dep. 30:9-23 and 32:1-18.

Burgerville's zero tolerance for drug or alcohol was published. Pharr received a copy of it when she was hired, she read it, and she knew that she could be tested based on reasonable suspicion. Amato Dec., Ex. 1 Pharr Dep. 30:11-20.

On November 9, 2013, both of Pharr's supervisors, Ms. Huntington and Ms. Xiong, suspected that Pharr was under the influence of alcohol. Helzer Dec. ¶28; Huntington Dec. ¶¶20, 21. Pursuant to Burgerville policies, the supervisors independently completed an observed checklist and after consulting with Mr. Helzer, the supervisors called AMR to conduct the test. Helzer Dec. ¶29, Ex. 18 and ¶30; Huntington Dec. ¶21, Ex. 11. Pharr took a drug urine test and refused to take the alcohol breathalyzer test. Helzer Dec. ¶31, Ex. 19; Huntington Dec. ¶23. Pharr acknowledges that Ms. Huntington explained to her the consequences of her refusal to take

the breathalyzer test, and despite knowing Pharr may be fired she left the premises instead of

taking the breathalyzer test. Amato Dec., Ex. 1 Pharr Dep. 140:7-13, 141:17-19; Huntington Dec.

¶23.

Pharr is not the only employee to have been terminated for their refusal to comply with

the Alcohol and Drug Free Workplace Policy.  Burgerville has consistently terminated other

employees, white employees, for their refusal to comply with the policy. Halpern Dec. ¶18.

Pharr has no evidence to support her allegation that her termination from employment

was based on her racial status, and Burgerville had a legitimate non-discriminatory reason for

ending her employment.

Pharr cannot establish a *prima facie* case of discrimination and Burgerville is entitled to

summary judgment on each of Pharr's discrimination claims.

**B.**     **Pharr Cannot Establish a *Prima Facie* Case of Harassment**

Pharr alleges that she was subject to racial harassment, but Pharr has failed to identify

any specific incident of "harassment" in her Complaint.  During Pharr's deposition, the only

incidents alleged by Pharr were related to her desire for more hours and for more drive-thru

training.  Pharr has failed to allege or identify any incidents that rise to harassment that form the

basis of a claim under 42 U.S.C. §1981, Title VII, and O.R.S. Chapter 659A.  Therefore, Pharr's

harassment claims must be dismissed.

To establish a prima facie case for hostile work environment in violation of 42 U.S.C.

§1981 and Title VII, Pharr must show that (1) she was subjected to verbal or physical racially

discriminatory conduct; (2) the conduct was unwelcome; and (3) the conduct was sufficiently

severe or pervasive to alter the conditions of his employment and create an abusive work environment. *See Surrell v. California Water Serv. Co.,* 518 F.3d 1097, 1108 (9th Cir. 2008); *Porter v. Cal. Dep't. Corr.,* 419 F.3d 885, 892 (9th Cir. 2005). The alleged racial harassment must be objectively offensive, not merely subjectively offensive. *Hayes v. Wal-Mart Stores, Inc.,* 781 F.Supp.2d 1080 (D.Or. 2011) (emphasis added). The objective standard is measured "from the perspective of a reasonable person with the same fundamental characteristics as the plaintiff." *Hayes,* 781 F.Supp.2d at 1087. Incidents must also be alleged with specificity regarding their time and nature for the court to consider them as evidence of his hostile work environment claim. *See Vasquez v. City of Los Angeles,* 349 F.3d 634, 642-643 (9th Cir. 2004) (court only considered specific of harassment plaintiff could identify, not plaintiff's general allegation he was "continually harassed"). Oregon law also requires a totality of the circumstances inquiry into whether the conduct is sufficiently severe or pervasive to alter the conditions of employment, and Oregon courts have held federal cases instructive. *See Harris v. Pameco,* 170 Or.App. 164, 176–78, 12 P.3d 524 (2000).

Even viewing the evidence of a hostile work environment in the light most favorable to Pharr and with all justifiable inferences drawn in her favor, Pharr is unable to establish the elements of a *prima facie* case for harassment. Pharr has no evidence to support the claim that she was subjected to a hostile work environment because of her race, African American, and therefore, Pharr has failed to show the existence of racially discriminatory conduct, let alone that it was sufficiently severe and pervasive enough to alter her working conditions and create an abusive work environment. Therefore, Burgerville is entitled to summary judgment on each of Pharr's harassment claims.

**C.     Pharr Cannot Establish a Prima Facie Case of Retaliation**

To establish a *prima facie* claim of retaliation, Pharr must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is sufficient evidence to infer a causal connection between the two. *Surrell,* 518 F.3d at 1109; *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003).  Only "non-trivial employment actions" can support a retaliation claim. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000).  Pharr's state law retaliation claim is analyzed under the Title VII elements. *See Logan v. West Coast Benson Hotel*, 981 F.Supp. 1301, 1319 (D.Or. 1997).

Title VII provides that it is unlawful to retaliate against an employee for engaging in protected activities, which include participating in proceedings or opposing unlawful employment practices. 42 U.S.C. § 2000e-3(a).  The sequence and burden of proof for Title VII retaliation claims are the same as those for claims of disparate treatment: (1) Pharr must first establish a *prima facie* case; (2) the burden then shifts to Burgerville to articulate a legitimate, non-discriminatory reason for its action; and finally (3) the burden shifts back to the Pharr to establish that the proffered explanation is merely a pretext for unlawful retaliation. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1053, 1064 (9th Cir. 2002).

The only incident that forms the basis of Pharr's retaliation claim is that she received the performance plan, IDP. Amato Dec., Ex. 1 Pharr Dep. 64:17-19.  Pharr alleges that she received the IDP because she had been requesting more hours on drive-thru training. Amato Dec., Ex. 1 Pharr Dep. 65:7-8.  Pharr claims that the IDP was retaliatory because prior to that she "was always complimented" on her work, despite the fact that she admits that prior to the IDP she had

conversation with Burgerville about her job performance. Amato Dec., Ex. 1 Pharr Dep. 65:9-12. And, despite the fact that the IDP followed her May 2013 annual performance review.

The overwhelming evidence is that Pharr was given the IDP as a tool to improve her performance after she requested written feedback and communication to help her better perform her job duties following her May 2013 annual performance review. Helzer. Dec. ¶18; Halpern Dec. ¶7, Ex. 2. The IDP was scheduled to last 30 days. Helzer. Dec. ¶26. After Pharr returned to work from her leave, she was in agreement to restart the IDP so she could have a full 30 days to improve her work performance. Helzer. Dec. ¶26; Halpern Dec. ¶14. Furthermore, Pharr admits that she asked for additional written communication about her day-to-day performance so she could see her performance. Amato Dec., Ex. 1 Pharr Dep. 129:1-18; Helzer Dec. ¶26; Halpern Dec. ¶14.

At Pharr's request, Mr. Helzer prepared the day-to-day documentation in a series of Records of Conversation and Coaching. Helzer Dec. ¶27. The purpose of the Records of Conversation and Coaching was that on each shift, a manger or team lead would provide Pharr timely feedback on her performance each day. Helzer Dec. ¶27, Ex. 17. Pharr admits that she found the Records of Conversation helpful to her. Amato Dec., Ex. 1 Pharr Dep. 129:1-130:25.

Neither Pharr's allegations nor her inconsistent testimony are sufficient for her to make out a *prima facie* retaliation case, and Burgerville is therefore entitled to summary judgment on all of Pharr's retaliation claims.

**D.       Pharr's Common Law Wrongful Discharge Claim Should be Dismissed**

Pharr has adequate state and federal statutory remedies, under 42 U.S.C. §1981, Title VII and O.R.S. Chapter 659A, and her wrongful discharge claim should be dismissed.

"The elements of a wrongful discharge claim are simple: there must be a discharge and that discharge must be 'wrongful.' " *Moustachetti v. Oregon*, 319 Or. 319, 325, 877 P.2d 66 (1994).  In general, an employee may be terminated for any reason, "absent a contractual, statutory or constitutional requirement [.]" *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 n. 2, 40 P.3d 1059 (2002).  However, "[a] termination is wrongful when an employee is terminated for: (1) fulfilling an important public duty; or (2) exercising a job-related right that reflects on important public policy.  Determining whether a public duty exists is a question of law." *White v. TA Operating Corp.*, Civil No. 06–1747–AA, 2008 WL 2557983 at 4 (D.Or. June 19, 2008) (citing *Babick*, 333 Or. at 407, 40 P.3d 1059).

The wrongful discharge claim constitutes an "interstitial tort, designed to fill a gap where a discharge in violation of public policy would otherwise not be adequately remedied." *Dunwoody v. Handskill Corp.*, 185 Or.App. 605, 613 (2003).  It is preempted by Pharr's 42 U.S.C. §1981 claim which provides an adequate remedy. *Henry v. Portland Dev. Comm'n.*, No. CV-06-712-HU, 2006 WL 4008709 at 3 (D.Or. Oct. 18, 2006).  Recently, recognizing that in 2007 O.R.S. §659A.030 was amended to provide additional remedies, Title VII and O.R.S. §659A.030 provide adequate remedies such that Pharr's wrongful discharge claim must be dismissed.

"Under Oregon law, the common law remedy for wrongful discharge or termination is available only in the absence of an adequate statutory remedy." *Courtney v. Oregon Dept. of State Police*, Civ. No. 06–6233–TC, 2008 WL 2726931 at 3–4 (D.Or. July 11, 2008) (citing *Delaney v. Taco Time Int'l, Inc.*, 297 Or. 10 (1984)). In *Draper v. Astoria School District No. 1C*, 995 F.Supp. 1122, 1130–31 (D.Or. 1998), abrogated on other grounds by *Rabkin v. Oregon Health Sciences University*, 350 F.3d 967 (9th Cir, 2003), the court stated that "a claim for common law wrongful discharge is not available in Oregon if (1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy (regardless of whether the courts perceive that remedy to be adequate)."

In the past, this district previously recognized a separate claim for wrongful termination where the plaintiff had also alleged discrimination under Title VII and its state law analogue, O.R.S. §659A.030. *See Halseth v. B.C. Towing, Inc.*, Civil No. 04–795–JE, 2005 U.S. Dist. LEXIS 42080 at 31 (D.Or. Aug.23, 2005). However, since the Oregon Legislature added compensatory and punitive damages to O.R.S §659.030, these expanded remedies are adequate when pursuing a claim under Title VII and O.R.S. §659A.030. *Battan v. Allwest Underground, Inc.*, Civ. No. 08–707–BR, 2008 WL 4191467 at 6 (D.Or. Sept. 5, 2008) (the court held that "[section] 659A.030(1)(f) provides adequate remedies to the extent Plaintiff intended to base his claim on wrongful discharge in retaliation for pursuing his right to be free from racial discrimination."); *see also Arnold v. Pfizer, Inc.,* 970 F.Supp.2d 1106, 1146 (2013); *Reid v. Evergreen Aviation Ground Logistics Enterprises, Inc.*, Civ. No. 07–1641–AC, 2009 WL

136019 at 16–17 (D.Or. Jan. 20, 2009) (surveying decisions in the District of Oregon that are in agreement with *Battan*).

Applying the reasoning in *Battan* that the expansion of the remedy provides for all compensation available under a wrongful termination claim, Pharr's wrongful termination claim under Oregon law is precluded because she is afforded adequate remedy under 42 U.S.C. §1981, Title VII, and O.R.S. §659A.030.

## VI    CONCLUSION

For all of the foregoing reasons, Burgerville respectfully requests that this Court grant its Motion for Summary Judgment on all of Pharr's claims in their entirety.

DATED: October 5, 2015.

WYSE KADISH LLP

*/s/ Lisa A. Amato*_____
Lisa A. Amato, OSB No. 920253
*laa@wysekadish.com*
Telephone: (503) 228-8448
Facsimile: (503) 273-9135
Of Attorneys for Defendant Burgerville, LLC

Trial Attorney: Lisa A. Amato, OSB No. 920253

**CERTIFICATE OF SERVICE**

I, Lisa A. Amato, hereby certify that the foregoing MEMORANDUM OF LAW IN

SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served on the

following parties was served on the following parties by regular mail and personal service:

> Sylvia Pharr
> 1700 NE 162nd Avenue, Building 1, Apt A1
> Portland, Oregon 97230

DATED: October 5, 2015.

*/s/ Lisa A. Amato*_____
Lisa A. Amato, OSB No. 920253
