Lisa A. Amato, OSB No. 920253
e-mail: laa@wysekadish.com
WYSE KADISH LLP
621 SW Morrison, Suite 1300
Portland, Oregon 97205
Telephone: (503) 228-8448
Facsimile: (503) 273-9135

Of Attorneys for Defendant
BURGERVILLE, LLC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

(Portland Division)

| | | |
|---|---|---|
| SYLVIA M. PHARR, | ) | Case No. 3:14-cv-1404-PK |
| Plaintiff, | ) | |
| v. | ) | **DECLARATION OF GEOFF HELZER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| BURGERVILLE, LLC, dba BURGERVILLE, | ) | |
| Defendant. | ) | |

I, Geoff Helzer, do depose and state as follows:

### A. Burgerville, LLC

1. I am the General Manager of the Burgerville Hawthorne location. I was the General Manager during Sylvia Pharr's employment.

2. This Declaration is based on my personal knowledge of the facts and circumstances of this matter, Burgerville's policies and procedures, and Ms. Pharr's personnel file.

3. Specific to Ms. Pharr's employment, I consulted and worked directly with Ms.

PAGE - 1 DECLARATION OF GEOFF HELZER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pharr, Assistant Managers Leah Huntington and Pangia Xiong, and Lacey Halpern at Xenium. Burgerville utilizes Xenium, a human resources consulting firm, and Lacey Halpern, PHR, was the designated HR Business Partner for Burgerville on this matter.

4. Crew Members perform the bulk of the work associated with serving Burgerville's customers. The duties of the Crew Members include taking customer orders while standing at the cash register or drive-through window; gathering food items to fill customer orders; operating the grills; cleaning and mopping the entire restaurant and collecting litter in the parking lot; restocking supplies and maintaining equipment as needed throughout the day; and replenishing soft drinks and french fries, among other tasks. Crew Members perform these duties as assigned, based on their skills and performance, but they are all part of the same job description and pay range. Exhibit 1 is a true and correct copy of Burgerville's Position Description for Crew Member.

5. Burgerville has a zero tolerance policy toward drugs and/or alcohol in the Workplace and where Burgerville has probable cause that an employee is in violation of this policy, the employee will be required to submit to testing to determine the presence, or use or any involvement with alcohol or drugs. An employee's failure to provide samples for testing will be considered insubordination and grounds for immediate suspension and later termination. Exhibit 2 is a true and correct copy of Burgerville's Alcohol and Drug Free Workplace Policy and Probable Cause Drug Test signed by Ms. Pharr.

### B. Plaintiff Sylvia Pharr's Employment

6. Ms. Pharr was hired as a Crew Member on March 4, 2012, and initially indicated that she was available to work "all days and all hours." Exhibit 3 is a true and correct copy of Ms. Pharr's work availability on her date of hire.

7. Burgerville managers took Ms. Pharr's availability preferences and skills into consideration when assigning her work shifts, which needed to be balanced with the preferences and skills of the nearly 40 other Crew Members at this restaurant.

8. Ms. Pharr had some difficulty with some of the duties of her position, but continued to work toward improvement.

9. In September, 2012, Ms. Pharr had a "till shortage," and received a corrective action. Exhibit 4 is a true and correct copy of the September 3, 2012 Employee Corrective Action.

10. In late 2012 Mr. Pharr began to ask to be assigned for more hours and to work at the drive-through. In response to Ms. Pharr's requests, she began to be trained on the drive-through window. In total, she was assigned three separate training or shadow shifts on the drive through, but she made several mistakes, including double-made milk shakes, a back-up on food being served, and not keeping up with making fries. Exhibit 5 is a true and correct copy of Ms. Huntington's note to Ms. Pharr's personnel file documenting Mr. Pharr's performance on the drive

through.

11. On January 11, 2013, Ms. Pharr asked Ms. Huntington if she could have more work hours. Exhibit 6 is a true and correct copy of Ms. Huntington's note to Ms. Pharr's personnel file documenting Mr. Pharr's request for more hours.

12. On January 18, 2013, Ms. Pharr asked Ms. Huntington if she could have more hours and be scheduled on drive-through. Exhibit 7 is a true and correct copy of Ms. Huntington's note to Ms. Pharr's personnel file documenting Mr. Pharr's request.

13. On February 18, 2013, Ms. Huntington and I talked with Ms. Pharr about her requests for more hours and to work at the drive-through. Generally, once an employee shows proficiency on counter i.e. limited errors, strong multi-tasking ability we schedule a person for a shadow shift on drive-through to initially see if it is a fit, which we did for Ms. Pharr in December 2012. If the drive-through experience goes well we move forward with a more formal training process on drive-through. In Ms. Pharr's situation, we were not seeing proficiency with her counter duties. She was not a strong multi-tasker and made significant errors as compared to other employees. We explained to Ms. Pharr that her outgoing demeanor was better suited for the slower pace of counter with more time to interact with guests and a much more forgiving atmosphere for potential errors. Exhibit 8 is a true and correct copy of Ms. Huntington's note to Ms. Pharr's personnel file documenting the conversation.

14. In March 2013, Ms. Pharr continued to press for more hours and to work the drive-through and we met with her again to explain to her that her skill set was best assigned to the counter. Exhibit 9 is a true and correct copy of Ms. Huntington's note to Ms. Pharr's personnel file documenting the conversation.

15. In May 2013, Ms. Pharr had her first formal performance review in which we noted areas of improvement, including improvement in areas of speed, accuracy, communication, and time management. As part of the performance review, Ms. Pharr completed a self-appraisal and she noted similar areas for her improvement. Exhibit 10 is a true and correct copy of Ms. Pharr's May 2013 performance review and self-appraisal.

16. On June 4, 2013, Ms. Pharr reduced her availability for work and no longer wanted to work Friday or Saturday after 5:00 p.m. Exhibit 11 is a true and correct copy of Ms. Pharr's work availability as of June 4, 2013.

17. Ms. Pharr continued to have performance deficiencies with accuracy, efficiency, communication and "listening and recall awareness" such as being able to fill a guest's order with the correct side dishes without having to repeatedly check the order). I and the Assistant Managers spoke with Mr. Pharr about these performance deficiencies frequently.

18. On June 19, Ms. Halpern and I met with Ms. Pharr to discuss her job performance. Ms. Pharr asked for written feedback and communication to help her better perform her job duties.

PAGE - 3 DECLARATION OF GEOFF HELZER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I prepared an Individual Development Plan (IDP) which is a tool used by Burgerville to communicate areas for improvement.

19. On June 26, 2013, Ms. Halpern and I met with Ms. Pharr to discuss the IDP and further discuss the areas in which we wanted to see improvement. Exhibit 12 is a true and correct copy of the IDP given to Ms. Pharr.

20. On July 29, 2013, at the end of Ms. Pharr's shift (approximately 11:00 p.m.), Ms. Pharr confronted Ms. Huntington in a confrontational and aggressive tone regarding her displeasure with her schedule and Ms. Huntington's failure to honor her preferences for Friday and Saturday nights off. At the end of this conversation, Ms. Pharr accused Ms. Huntington of being a racist for not scheduling her at the drive-through and for requiring her to work the lot/lobby shifts and closing shifts. Exhibit 13 is a true and correct copy of the written report prepared by Ms. Huntington in Ms. Pharr's personnel file.

21. Upon learning about the July 29, 2013 incident, I wanted Ms. Pharr's allegations of discrimination investigated. I asked Ms. Halpern to promptly investigate this allegation of discrimination.

22. On or about August 13, 2013, Ms. Halpern and I met with Ms. Pharr to discuss the July 29 incident and to learn from her what happened.

23. On August 25, 2013, Ms. Pharr again reduced her availability for work and no longer wanted to work any day after 5:00 p.m. Exhibit 14 is a true and correct copy of Ms. Pharr's work availability as of August 5, 2013.

24. On approximately August 30, 2013, Ms. Halpern finished her investigation of Ms. Pharr's allegations of discrimination and concluded that there was no evidence of discrimination.

25. I finalized the verbal warning for Ms. Pharr's inappropriate behavior on July 29. On September 4, 2013, Ms. Halpern and I met with Ms. Pharr and discussed with her the verbal warning. Exhibit 15 is a true and correct copy of the verbal warning.

26. The original IDP was scheduled to proceed for 30 days at which point we were going to assess Ms. Pharr's improvement. During that 30 day period and before the July 29, 2013 incident with Ms. Huntington, Ms. Pharr took personal leave from work and there was insufficient time to allow Ms. Pharr to improve under the IDP. I discussed this with Ms. Pharr and she agreed that we should restart the IDP to give her time to improve and for Burgerville time to help Ms. Pharr in her improvement. Exhibit 16 is a true and correct copy of the restarted IDP dated September 4, 2013.

27. Following the restart of the IDP, Ms. Pharr asked for additional written communication about her day-to-day performance so we established a series of Records of Conversation and Coaching. The goal was that on each shift, a manger or team lead would

provide Ms. Pharr about timely feedback on her performance each day. Exhibit 17 is a true and correct copy of the Records of Conversation and Coaching.

28. On November 9, 2013, Ms. Pharr's supervisors were Leah Huntington and Pangia Xiong. I received a call from Ms. Huntington informing me that she and Ms. Xiong felt they had probable cause to conduct an on-the-job alcohol sobriety test based on Burgerville's policies and I asked them to complete an observed behavior checklist.

29. Ms. Huntington and Ms. Xiong completed the observed behavior checklists and documented their observations, pursuant to the Probable Cause Drug Test policy in which a manager verifies observations if possible. Exhibit 18 is a true and correct copy of Ms. Huntington and Ms. Xiong's observed behavior checklists and summary of their observations.

30. After completion of the observed behavior checklist and consulting with me, American Medical Response (AMR) was called to conduct an alcohol breathalyzer test based on reasonable suspicion that she was under the influence of alcohol in violation of Burgerville's policies.

31. Ms. Pharr was given a urine drug test by the AMR tech. When the AMR tech attempted to give Ms. Pharr the breathalyzer test, Ms. Pharr refused the test. Ms. Pharr then left the Hawthorne store premises. Safe transportation to her place of residence was also offered, which she refused. Exhibit 19 is a true and correct copy of the AMR incident report.

32. After the alcohol testing incident, I consulted with Ms. Huntington and Ms. Halpern about the incident and we evaluated Ms. Pharr's continued employment. I decided that pursuant to Burgerville's Alcohol and Drug Free Workplace Policy that Mr. Pharr's employment would be terminated as of November 9, 2013. Exhibit 20 is a true and correct copy of Ms. Pharr's termination notice.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.**

Dated this 7th day of August, 2015.

BY: /s/ Geoff Helzer
Geoff Helzer