**Lisa A. Amato,** OSB No. 920253
e-mail: laa@wysekadish.com
WYSE KADISH LLP
621 SW Morrison, Suite 1300
Portland, Oregon 97205
Telephone: (503) 228-8448
Facsimile: (503) 273-9135

Of Attorneys for Defendant
BURGERVILLE, LLC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

(Portland Division)

| | | |
|---|---|---|
| SYLVIA M. PHARR, | ) | Case No. 3:14-cv-1404-PK |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF LEAH** |
| v. | ) | **HUNTINGTON IN SUPPORT OF** |
| | ) | **DEFENDANT'S MOTION FOR** |
| BURGERVILLE, LLC, dba | ) | **SUMMARY JUDGMENT** |
| BURGERVILLE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I, Leah Huntington, do depose and state as follows:

**A.     Burgerville, LLC**

1.     During Sylvia Pharr's employment I was one of her Assistant Managers at the Burgerville Hawthorne location.

2.     This Declaration is based on my personal knowledge of the facts and circumstances of this matter and Burgerville's policies and procedures.

4. Specific to Ms. Pharr's employment, I consulted and worked directly with General Manager, Geoff Helzer, Assistant Manager, Pangia Xiong, and with Lacey Halpern at Xenium. Burgerville utilizes Xenium, a human resources consulting firm, and Lacey Halpern, PHR, was the designated HR Business Partner for Burgerville on this matter.

5. Ms. Pharr was hired as a Crew Member. Her duties included taking customer orders while standing at the cash register or drive-through window; gathering food items to fill customer orders; operating the grills; cleaning and mopping the entire restaurant and collecting litter in the parking lot; restocking supplies and maintaining equipment as needed throughout the day; and replenishing soft drinks and french fries, among other tasks. Crew Members perform these duties as assigned, based on their skills and performance, but they are all part of the same job description and pay range.

6. Burgerville has a zero tolerance policy toward drugs and/or alcohol in the Workplace and where Burgerville has probable cause that an employee is in violation of this policy, the employee will be required to submit to testing to determine the presence, or use or any involvement with alcohol or drugs. An employee's failure to provide samples for testing will be considered insubordination and grounds for immediate suspension and later termination.

B. **Plaintiff Sylvia Pharr's Employment**

7. Ms. Pharr was hired as a Crew Member on March 4, 2012, and she initially indicated that she was available to work "all days and all hours" Exhibit 1 is a true and correct copy of Ms. Pharr's work availability on her date of hire.

8. When scheduling, take every employee's availability preferences and skills into consideration when assigning work shifts, including Ms. Pharr's, which needed to be balanced with the preferences and skills of the nearly 40 other Crew Members at the restaurant.

9. During Ms. Pharr's employment she had some difficulty with some of the duties of her position, but continued to work toward improvement.

10. In late 2012, Mr. Pharr began to ask to be assigned for more hours and to work at the drive-through. In response to Ms. Pharr's requests, we began to train her on the drive-through window. She was assigned three separate training or shadow shifts on the drive through; however, she made several mistakes, including double-made milk shakes, a back-up on food being served, and not keeping up with making fries. Exhibit 2 is a true and correct copy of the documentation I prepared regarding Mr. Pharr's performance on the drive through.

11. On January 11, 2013, Ms. Pharr asked me if she could have more work hours. Exhibit 3 is a true and correct copy of the documentation I prepared regarding Mr. Pharr's request for more hours.

12. On January 18, 2013, Ms. Pharr asked me if she could have more hours and be

scheduled on drive-through.   Exhibit 4 is a true and correct copy of the documentation I prepared regarding our conversation.

13.     On February 18, 2013, Mr. Helzer and I spoke with Ms. Pharr about her requests for more hours and to work at the drive-through.   Generally, once an employee shows proficiency on counter i.e. limited errors, strong multi-tasking ability we schedule a person for a shadow shift on drive-through to initially see if it is a fit, which we did for Ms. Pharr in December 2012.   If the drive-through experience goes well for that employee, we move forward with a more formal training process on drive-through.   In Ms. Pharr's situation, we were not seeing proficiency with her counter duties.   She was not a strong multi-tasker and made significant errors as compared to other employees.   We explained to Ms. Pharr that her outgoing demeanor was better suited for the slower pace of counter with more time to interact with guests and a much more forgiving atmosphere for potential errors.   Exhibit 5 is a true and correct copy of the documentation I prepared regarding this conversation.

14.     In March 2013, Ms. Pharr continued to press for more hours and to work the drive-through, and we met with her again to explain to her that her skill set was best assigned to the counter.   Exhibit 6 is a true and correct copy of the documentation I prepared regarding this conversation.

15.     I did my best to schedule Ms. Pharr to work more hours given her skill set, giving her up to at least seven more hours a week.   On April 7, 2013, Ms. Pharr was working a "lot and lobby" shift and she confronted me and asked why I scheduled her for that shift.   I replied that I was doing my best to give her more hours, but she did not like the shift assignment and told me that I could give the shift to someone else.   Exhibit 7 is a true and correct copy of the documentation I prepared regarding this conversation.

16.     On June 4, 2013, Ms. Pharr reduced her availability for work and no longer wanted to work Friday or Saturday after 5:00 p.m.   Exhibit 8 is a true and correct copy of Ms. Pharr's work availability as of June 4, 2013.

17.     Ms. Pharr continued to have performance deficiencies with accuracy, efficiency, communication, and listening and recall awareness such as being able to fill a guest's order with the correct side dishes without having to repeatedly check the order).   Mr. Helzer and I spoke with spoke with Mr. Pharr about these performance deficiencies frequently.

18.     On July 29, 2013, at the end of Ms. Pharr's shift (approximately 11:00 p.m.), Ms. Pharr cornered me in my office and in a confrontational and aggressive tone regarding her displeasure with her schedule and accused me of failing to honor her preferences for Friday and Saturday nights off.   At the end of this conversation, Ms. Pharr accused me of being a racist for not scheduling her at the drive-through and for requiring her to work the lot/lobby shifts and closing shifts.   Exhibit 9 is a true and correct copy of the written report that I prepared regarding this incident.

19. On August 25, 2013, Ms. Pharr again reduced her availability for work and no longer wanted to work any day after 5:00 p.m. Exhibit 10 is a true and correct copy of Ms. Pharr's work availability as of August 5, 2013.

20. On November 9, 2013, Pangia Xiong and I were the Assistant Managers on duty. During the busy lunch hour rush, I observed that Ms. Pharr forgot to ring in whole meals for guests, she slurred her speech several times while reading back orders to guests, and she seemed confused on several occasions. Her tone was more aggressive than usual, and her appearance which was normally very put together, but that day her hair was a mess and her shirt was not clean.

21. Ms. Xiong also noticed the smell of alcohol. Ms. Xiong and I independently complete the observed behavior checklists and compared them. I then contacted Mr. Helzer to discuss the situation with him. The decision was made to give Ms. Pharr an alcohol breathalyzer test. American Medical Response (AMR) was called to conduct an alcohol breathalyzer test based on reasonable suspicion that she was under the influence of alcohol in violation of Burgerville's policies. Exhibit 11 is a true and correct copy of the observed behavior checklists and my summary of my observations.

22. After this decision was made, I pulled Ms. Pharr aside and informed her of our observations. Ms. Pharr admitted to having several cocktails at a birthday party the night before, denied being under the influence of alcohol, and said that she had forgotten to brush her teeth.

23. Ms. Pharr was first given a urine drug test by the AMR tech. When the AMR tech attempted to give Ms. Pharr the breathalyzer test, Ms. Pharr refused the test. I explained to Ms. Pharr that if she refused to take the breathalyzer test, pursuant to Burgerville policies, we will assume a positive result and I would have to suspend her pending investigation. Ms. Pharr replied that she was fine with that and that she did not want to take the test. I wanted to make sure that Ms. Pharr understood the implications of her refusal to take the breathalyzer test so I again explained the consequences to her. She again told me that she wanted to leave, so I told her that she was suspended pending an investigation and I instructed her to clock off and collect her things.

24. We offered Ms. Pharr a cab ride home to get her home safely. Ms. Pharr refused the cab ride and drove off the premises in her own car.

///

///

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Dated this 19 day of August, 2015.

BY: _____
Leah Huntington

PAGE - 5 DECLARATION OF LEAH HUNTINGTON IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT